1

                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,    .    Case No. 3:13-CR-00230
                             .    (EBB)
               Plaintiff,    .
                             .    New Haven, Connecticut
     v.                      .    November 18, 2014
                             .
JESSE KAPLAN,                .
                             .
               Defendant.    .
. . . . . . . . . . . . . . . .

                      SENTENCING HEARING
            BEFORE THE HONORABLE ELLEN BREE BURNS
             SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Plaintiff:          Office of the U.S. Attorney
                        By:  VANESSA RICHARDS, AUSA
                        1000 Lafayette Boulevard
                        10th Floor
                        Bridgeport, Connecticut 06604

For the Defendant:      Federal Public Defender
                        By:  PAUL F. THOMAS, ESQ.
                        265 Church Street
                        Suite 702
                        New Haven, CT 06510

Official Court
Reporter:               MR. STEPHEN C. BOWLES

_____

BOWLES REPORTING SERVICE
P.O. BOX 607
GALES FERRY, CONNECTICUT 06335
(860) 464-1083

(Proceedings commenced at 9:40 a.m.)

THE COURT:  Good morning.

COUNSEL:  Good morning, Your Honor.

THE COURT:  Please be seated.

Do you think we could pull that curtain over just a bit?  See the sun coming through there?  It's right in my eyes.

THE CLERK:  I don't know why they put them that way.

THE COURT:  I don't either.  Maybe you can't do anything.  I'll try not to -- I'll ignore it, or I'll try to ignore it.

Don't worry about it.  I can move now.  That may be a little bit better.

Mr. Kaplan, Mr. Thomas, would you come to the lectern, please?

I've taken note, Mr. Thomas, of your objection, sir, and I have determined that the appropriate Sentencing Guideline range in this case is 46 to 57 months, and that is the range which I'm adopting, and I'll entertain your remarks now, sir.

MR. THOMAS:  Yes, Your Honor.

Before making those remarks, there were --

THE LAW CLERK:  You want me to call maintenance?

THE COURT:  Excuse me?

THE LAW CLERK:  You want me to call maintenance?

THE COURT:  No.  No.  I'll survive.  I'll look the other way.

MR. THOMAS:  Thank you, Your Honor.

I have submitted to Your Honor, two briefs that address several points.  One was where the starting point is for any consideration of sentencing, the --

THE COURT:  Yes, sir.

MR. THOMAS:  -- benchmark, and Your Honor has said that is 46 to 57 months.  Of course, in the -- both under the Guidelines in the pre-Booker area, and since Booker, in the last roughly ten years, Courts were given latitude to impose sentences outside the Guideline range, lower or higher, rarely higher but occasionally higher, if there were circumstances of unusual or particular nature that warranted consideration of something outside the range.

In Jesse Kaplan's case we have submitted that there are such reasons for a non-Guideline, or a departure from 46 to 57 months.

Fundamentally, Jesse Kaplan, the young man who is standing beside me today, is a different man

than the Jesse Kaplan who I met in really extreme -- extremely desperate condition almost a year ago when he was arrested in this case.  At that point he was really a full-blown addict.  He had really untreated mental health problems, and the combination was potentially deadly.

As sometimes happens in federal prosecutions, an individual can be saved really, by the intervention of the legal system, and I think because of what happened with Jesse, him getting arrested, he was brought to the federal judicial system where he has been transformed.

Jesse had had prior opportunities for treatment and, as is typical of people with co-occurring mental health problems and addiction problems, the treatments had been largely ineffective. The ineffectiveness of the treatment had left him vulnerable to continued abuse and had made him vulnerable to the overture from the co-Defendant in this case, to involve himself not just in using, but in committing the crimes that brings him here facing the benchmark sentencing range of 46 to 57 months.

But in the past 11 months Jesse has transformed himself, with the trust of the Courts.

First, Magistrate Judge Garfinkel took a bit

of a leap of faith.  We never know when we let somebody out on custody (phonetic), if they will respond favorably, and there were some pitfalls en route, but Jesse was successfully discharged from inpatient treatment at a program in New York, that took some time to find because of his co-occurring mental health problems, his suicidal gesture, and his substance abuse history.  And Judge Garfinkel made that -- took that leap of faith and it was warranted.

And the Government, all along, has, I think, looked at Jesse Kaplan as a hardened criminal who shouldn't get those kind of breaks, and over objection he got that opportunity.

He made -- He successfully completed inpatient treatment, was discharged from an outpatient treatment program where he has done well now for the better part of a year, as attested to by the letters that I provided to Probation, to the Government and to Your Honor.  He is doing extremely well.

And the legal system, the criminal justice system has come to recognize that that is a -- really an important factor in deciding upon a fair sentence. Is the person who committed a crime less likely, really, to reoffend, because they have transformed themselves, or are in the act of transforming

themselves through treatment?

The record in this case shows, contrary to the Government's kind of grudging acknowledgment, that Jesse Hopkins indeed -- Jesse Kaplan indeed suffers from a combination of mental health problems, as well as the co-occurring substance abuse problems, both of which now have been effectively treated for the better part of a year, as attested to by the letters Your Honor has.

I do intend, Your Honor, to call today to speak briefly to Your Honor, two people to augment the letters that were submitted.  One, his sponsor at AA; and the other, his cousin, Attorney Alan Maigher, who knows the family well and who has suffered alongside the family, as Jesse has suffered over these many years.

So, extraordinary rehabilitation is an important factor, it's a mitigating factor, and it's one that is established here.

Another factor the Court can consider is alone, the fact of the mental health problems and the addiction, as they contributed to the offense itself. This was not an offense that was driven by greed.  It was an offense driven by addiction.

The Court can also consider the fact that the

Guidelines themselves, for this rate of drugs, is the highest for any of the similar class of pharmaceutical painkillers, higher than for -- The Government, I think, rightly argues there is a major difference between street drugs like heroin and oxycontin, which is a pure pharmaceutical, but morphine is a pure pharmaceutical, fentanyl is a pure pharmaceutical, Dilaudid, which is the drug that had captured Mr. Kaplan, are all pharmaceuticals, and all sentenced on a less punitive way than oxycontin.

There can be some reasons, I'm sure, why oxycontin could be treated worse, but conversely, I don't know that the Court needs to find that a sentence within the Guideline range, which is so much higher than for those other drugs, is justified.

And then I have made a somewhat impassioned argument in this case, about the historical trend towards overimprisoning too many people for drug offenses, relatively low-level drug offenders. Government can say Jesse Kaplan wasn't low level, but when Congress passed the big laws punishing big dealers, they had in mind, traffickers, not essentially street-level dealers, but what has happened over the years was that the application of those harsh penalties fell upon the lower-level dealers, leading to this vast

expansion of imprisonment of so many people who broke the laws, but were themselves, in a sense, victims of drugs, addicts.

And I think there has developed a counter-trend in the past few years. I'd like to think that it started in this district because it's in this district where more than any other district, judges have found reasons to depart for lower Guidelines, but even as recently as last week, Your Honor, Attorney General Holder addressed a gathering and made comments about the need to find better ways to address the drug problem.

The best way to address it, the most cost-effective way, the most sensitive way, the most humane way is to treat it, and Jesse Kaplan is -- exemplifies how that can work. It's a lifetime struggle. This is not something where you take an antibiotic and you're cured of an infection. The nature of the problems that contributed to Jesse's addiction are ones that will last through his lifetime, and there will always be his risk of relapse that requires really, essentially, eternal vigilance.

He has, as attested by the letters from his treaters, shown that he is up to that task, and I'd just like to quote briefly from a couple of the

letters.

Stephen Schechter, Your Honor, who is one of his case managers at Arms Acres Rehab, said he worked with as much energy and conviction as a man who yearns recovery could possibly  want.

Lindsay Allen, a licensed social worker, speaks about the essential elements of his continued success, those being individual therapy, medication management, self-help and other substance abuse treatment, and having a well-established structure and routine, and it says:

"However, the most important factor in managing mental health and sobriety is Mr. Kaplan's commitment to his future, and he has demonstrated this consistently over the past nine months."

As noted by Dr. Lee, Mr. Kaplan is currently on a host of medications, and between the effect of those medications and obtaining sobriety, putting time between himself and the effect of addiction, Jesse Kaplan really has transformed himself into a person who today is so different from the person he was a year ago when I met him, and I submit, different from the person who was committing the crimes that exposes him to a sentence of up to 20 years, I think it is, and within a

Guideline range of essentially four to five years.

I've urged the Court to take into consideration, his various mitigating factors that take the offense out of the heartland, in the sense that he was an addict who was doing what he did to support his own addiction.

He was in recovery when he was approached by a co-Defendant with an offer that he should have refused, but he was vulnerable and went along with it and did it a lot, and for that, faces a sentence of four to five years, but that -- and so that makes him different from the person who has no such addiction at the time of the offense, nor like the person he is, who has, when given the opportunity, first by Judge Garfinkel then by Your Honor when he pled guilty, and on balancing all the considerations, allowed him to continue treatment, has made these tremendous strides towards recovery, to the point that his father, in his letter to the Court, in his comments to Probation, essentially said that Jesse -- he's regained a son, a son that he had before all of these problems really exploded and took Jesse away, and could have killed him or could have caused him to do something that would have not exposed him to several years in prison, but perhaps the better part of a lifetime.

So, in some respects Jesse is lucky to be here today, to be supported by friends and family, to be hoping for a sentence that doesn't take away too much of his future, that affords him the opportunity still, to continue this lifelong path towards recovery.

And with that, Your Honor, I would ask -- Well, let me introduce. In the courtroom in support are Jesse's father, Woody Kaplan; his -- what I'll call his "Little Brother," John Castarella from Big Brothers; and John's mother, Tina Cora, who came; and Alan Maigher, his cousin; and Joe Engel, his sponsor at AA.

And with that, Your Honor, I'd ask Joe Engel to address the Court.

THE COURT:  Certainly.

MR. ENGEL:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ENGEL:  I'm here to speak on Jesse's behalf, and got involved --

THE CLERK:  Could you please identify yourself for the record.

MR. ENGEL:  I'm Joe Engel.

THE CLERK:  Spell your last name?

MR. ENGEL:  E-N-G-E-L.

I met Jesse about seven months ago in an AA

meeting in Bedford, New York, and I got interested in his case as soon as I met him.

I'm a sober, recovering addict. I've been sober, this will be my 28th year in sobriety in the fellowship of Alcoholics Anonymous.

I think Jesse's case is a simple case of addiction more than anything else. I've reached out to his probation officer in the process, to attempt to get him to go to more meetings. I've touched base with his counselors in these outpatient rehab facilities. He does have permission to go to an AA meeting once a week on Saturdays. He reaches out to me regularly to attend that meeting with him.

I asked him, as his sponsor, to contact me regularly, every day, tell me how his day is going.

I spoke about him last night at an AA meeting. I brought an AA meeting to Yorktown Heights, New York on an outgoing commitment, and I spoke about a man that I'm sponsoring that is facing a long-term prison sentence. And he specifically said to me yesterday, that he was okay, and he's okay with the consequences, and he's okay with the outcome, and he was willing to be responsible for the crimes he committed, but at the same time he wants to go into -- you know, if prison is his sentence, he wants to go

into prison sober and he wants to leave prison sober, and I believe he will carry the message of AA behind prison walls, or outside as a free man. I believe that.

I also believe, unfortunately, this disease is powerful, and if he continues to use drugs that, you know, he belongs in jail, unfortunately. That's the unfortunate reality of addiction in this world. There are certain people who, you know, can be exposed to AA, to be exposed to a program of recovery, and one day at a time, continue with it, and I think he should have that opportunity.

Thank you, Your Honor.

THE COURT: Thank you, sir.

MR. THOMAS: Mr. Maigher?

MR. MAIGHER: Your Honor.

THE COURT: Good morning.

THE CLERK: Please identify yourself and spell your last name.

MR. MAIGHER: Yes, Alan Maigher, M—A-I-G-H-E-R, Westport, Connecticut.

Your Honor, it's been many years.

THE COURT: It has.

MR. MAIGHER: I did not anticipate that I would appear my next time in front of you, under these

14

circumstances, but life takes some strange turns, and life took some very tough turns for Jesse.

My cousin, Woody, he and I are first cousins, our parents were siblings, and I believe Jesse and my son, and two other Maigher cousins, were born about the same time.

Life took some strange turns for Jesse, and I want to address one essential point that I think the Government focuses on that I don't think paints an accurate picture.

The loss Jesse's mother when he was just 13, it's a devastating blow to him, and he already had some mental health problems, whose family on his mother's side had some predispositions to self-destructive behavior, and my cousin, Woody, left with two adolescent children at that time, was just about as much as any young father could handle.

Jesse went off the tracks. I think last December was probably the abyss, but as Mr. Thomas has so aptly said, I think Jesse realized soon after that, that there's nowhere else to go, and I think he's managed the -- again, the loss of his mother, who was the fountain head of that family, allowed time and circumstances to lead Jesse down a path that he never should've gone, he never should've gone.

He's not a criminal at heart.  He's got a good heart.  He's a decent young man.  He cares very much about his father and his sister and, I believe, Your Honor, that he is well on the way back.  I think the record over the last nine months in rehab and in treatment has been exemplary.  He has a chance to make something of his life, Your Honor.

I have no doubt that justice will be done this morning, but I want to thank you, Your Honor.  I just want to consider all of the factors for my cousin, Jesse.

Thank you so much.

THE COURT:  Thank you.  Thank you, sir.

MR. THOMAS:  And finally, Your Honor, Mr. Kaplan himself has prepared thoughtful remarks that he's going to read to Your Honor.

THE DEFENDANT:  My name is Jesse Kaplan, K-A-P-L-A-N, from Pound Ridge, New York.

"Dear Honorable Judge Burns and respectful Members of the Court:

I stand before you today as a man who has endured a very difficult path in life.  The challenges I have faced and encumbered have been extremely difficult, and the choices I have made in my life has not always been for

the best.

I know what I have done and accept the responsibilities for my actions, as well as the consequences, as I have in the past. Today we are faced with the crimes I committed while in a battle with something unlike I have ever faced before, something I couldn't beat: addiction.

Despite being in over 12 different programs, including inpatient centers, detox programs, intensive outpatient centers, and being pronounced unresponsive after overdosing twice, which included having to be revived with adrenaline and Narcan being injection (phonetic) into my heart, was not enough to overcome this evil monster that wanted me dead. Today this is changed.

Thirteen months ago my door was broken down and I was federally indicted for the crimes I had committed. I was put to what I deem the worst place on Earth, New Haven County Corrections. After several months, it was only through the grace of Judge Garfinkel, my higher power and Your Honor, that I was allowed to attend an inpatient rehabilitation

program, and allowed to begin to start a fresh life.

Tomorrow I celebrate eleven months clean from all my mind-altering substances, including drugs and alcohol.

Since working with the sponsor, who has 28 years clean, the Fellowship of AA, and other addicts and alcoholics who share the same disease that engulfed  me and has left my life in complete turmoil, I have been able to live a healthy and law-abiding life.

I must also mention that it's through the limitations the Court has put in place which has helped me develop and maintain orderly structure and routine on a day-to-day basis.

Life is a constant battle, as I have learned by watching my father lose his wife of 25 years to unnatural causes, and nearly both his kids to the disease of addiction.  I don't want to do that to him nor to myself.

I am due to be an uncle in eight short weeks, and I also want to get married and have a family of my own.

I understand that everyone faces challenges, and it's how we choose to deal with them.  My

18

old way of thinking got me here, and that way, I can say, is finally done.  I'm no longer willing to jeopardize my freedom or my life for any substance or crime.  My behavior is certainly not to be excused, but perhaps if you can see the progress that I've made, I would ask that Your Honor look at this in making your decision.

Respectfully, Jesse Kaplan."

THE COURT:  Thank you, Mr. Kaplan.

THE DEFENDANT:  Thank you, Your Honor.

THE COURT:  Anyone else, Mr. Thomas, wants to speak?

MR. THOMAS:  Not at this point.

THE COURT:  May I hear from the Government, please?

MS. RICHARDS:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. RICHARDS:  Vanessa Richards for the Government.

I understand that Your Honor has found that 46 to 57 months is the Guideline range.  I want to note for the record, my objection.  The evidence in this case demonstrates that Mr. Kaplan was actively involved in a conspiracy.  He then pleaded guilty to possession

19

with intent to distribute and distribution of oxycodone. He pled guilty to conspiracy to do so.

His co-Conspirator in this case, Donald McCann, during the course of their conspiracy, distributed and illegally obtained an additional 3,000 30 milligram pills.

The communications between Mr. Kaplan and Mr. McCann indicate that they were very much -- it was very much a joint effort, how they obtained these narcotics. Mr. McCann created the false prescriptions and created the false identifications with the instruction and assistance of Mr. Kaplan.

Mr. Kaplan knew, as the text messages between them make plain, knew his characters better than Mr. McCann. He knew where different aliases needed to go, to which pharmacies to fill, and went.

Mr. McCann was paying Mr. Kaplan's expenses in this regard. He paid for the cost of prescriptions, which were several hundred dollars over the course of the conspiracy.

And additionally, and according to Mr. Kaplan in text messages, Mr. Kaplan had accompanied Mr. McCann to -- I think it's on at least one occasion.

In the year or so that we estimate Mr. Kaplan and Mr. McCann knew one another, based on Mr. McCann --

Mr. Kaplan's statements, rather, Mr. McCann went to Mohegan Sun over a dozen times. In each instance he gambled hundreds if not thousands of dollars, and in each instance, prior to going to the casino, he picked up oxycodone, which we believe he sold at the casino and then gambled the proceeds.

Mr. McCann lives in the basement of his parents' house. It was absolutely reasonably foreseeable to Mr. Kaplan, that he would obtain oxycodone by the same manner and means that Mr. Kaplan was obtaining oxycodone, and that he would distribute it unlawfully, and that's where the money was coming from, that's where the money to buy the oxycodone prescriptions was coming from. That's where the money to stay at Mohegan Sun was coming from. That's where the money to gamble at Mohegan Sun was coming from.

So again, I start from the position that 70 to 87 months is the correct Guideline, understanding that Your Honor has taken a different position.

In terms of Mr. Kaplan, listening to Mr. Thomas and listening to the witnesses for the Defendant, you would think that the Defendant was a neophyte, he was just someone who fell into this, and the reality is that's just not true. The reality is that Mr. Kaplan has been here before, and he's been

here before for very similar conduct.

He was here in 2007 when he was illegally selling prescription pills, granted not narcotics, but prescription pills for money, for $12,000.  He had the opportunity at that point to avail himself of all the benefits that he now claims have saved him, and he chose not to, and instead he continued to engage in criminal activity, continued to engage in criminal activity that landed him in prison for nine months, and then when he was released, again engaged in criminal activity, in terms of at least one forgery conviction.

So, my concern in this situation, and what I need to be concerned with as a representative of the United States of America is -- and for the people of this district, is whether or not Mr. Kaplan is indeed going to engage in this conduct again, and what is an appropriate punishment for someone who does what he did, because what he did was in a very short period of time, circulate over a thousand 30 milligram pills, and when you circulate those pills you're circulating them to addicts.  You're circulating them, and giving them, and selling them to people who are in desperate situations, exact situation Mr. Kaplan stands up here to avail himself, or to explain.

His conduct contributed to other people's

addictions and other people's deteriorations, in terms of their lives.

As I stated in my sentencing memo, oxycodone, it's not like fentanyl, it's not like morphine. Fentanyl and morphine, for example, are drugs that frankly aren't prescribed with the frequency that oxycodone is, and part of what has happened in this country is that oxycodone was overprescribed, substantially, it continues to be overprescribed, and as a consequence, it's easily available and it makes its way out onto the black market.  It is also highly coveted on the black market.

It is for those reasons that -- in particular, that oxycodone is treated differently than, say morphine or fentanyl, which are not prescribed with the same frequency, and which honestly are not as coveted on the street as is oxycodone.

Additionally, and going back to this idea of how distribution affects other people's lives, as I mentioned in the sentencing memo, oxycodone is one of the world's greatest gateway drugs, and what we see over and over again is, particularly young people, frankly, become addicted to oxycodone after they have either taken it at a party or been legitimately prescribed it following some sort of injury.  They take

oxycodone for as long as they can, for as long as they can get it.  They try and buy it on the streets.  It's very expensive.

Mr. Kaplan himself is accused, in the Naugatuck case, of -- or the evidence, at least, from the Naugatuck case, at this point, which granted, is just (unintelligible), is that he was attempting to sell 60 oxycodone pills for $16 a pill.  That's a substantial amount of money.

In terms of what then happens, eventually people can't get oxycodone anymore.  They can't get it on the streets, they can't afford it, and they devolve into heroin, and that's what we're seeing.  We're seeing it over and over and over again.

And Mr. Kaplan's statement to Your Honor, not once did he apologize for that conduct.  Not once did he say that he was sorry for what he had done.  Not once did he apologize to the addicts that he supported and supplied.  His apology is really for his family and for himself being in this situation.

Ultimately, I want to respond to a few things that the various witnesses said and that Mr. Thomas said.

One of the witnesses said, and I think a couple people said that, "Addiction is a lifetime

struggle," and that, "Addiction is, in fact, a powerful disease." I agree with that statement. I think that's true.

I think that one of the reasons why Mr. Kaplan was able to fly right, to the extent that he did, and I think it should be noted that there were quite a few hiccups along the way, was because of this moment, because of the impending possibility of a sentence.

I agree with Mr. Thomas that these are the moments when the criminal justice system can save people's lives. I think if Mr. Kaplan doesn't receive a significant sentence, my concern is that he's going to think he can come back and do this again, and that there no consequences to him because the reality is when he's received little to no consequence in the past, it hasn't deterred him in the least.

And so we're asking for a significant sentence to keep him on the straight and narrow. We believe that when he's in prison, number one, he can avail himself of all of the drug treatment programs that prison has to offer, which are significant in terms of their number.

We also believe that when he is out, as a result of being incarcerated, there will be something

else to counterbalance that addiction, the fear of returning to prison, and that that would be real and that would be meaningful.

Additionally, general deterrence in this situation is incredibly important.  It's important for the justice system to recognize that you can't unlawfully distribute drugs for a significant period of time, because again, remember, it's not just this case, it's his prior conduct as well, and it's taking all of that into account.  You can't violate the federal law of the United States repeatedly for a period of time, and then receive absolutely no consequence for that.  It sends the wrong message to those who might follow in Mr. Kaplan's footsteps, and it also doesn't address the seriousness of what he did because, as I mentioned, what he did was distribute a really dangerous drug to other people.

And I want to point out, it wasn't just distribute it to Mr. McCann, in case that is the issue.  It wasn't just giving it to Mr. McCann.  As I mentioned, in the Naugatuck case Mr. Kaplan's girlfriend --

MR. THOMAS:  Your Honor, I am going to object.  I hesitate to do so but that is a pending case.  Nothing has been proven.  Allegations only, have

been made.

MS. RICHARDS:  And allegations --

MR. THOMAS:  Government counsel previously referred to that in terms of "evidence."  There is no such thing as evidence before Your Honor regarding any of the accusations, other than the fact of the accusations, as we stated in the Presentence Report.

MS. RICHARDS:  Your Honor, if I may respond just briefly?

First of all, the Rules of Evidence don't apply in a sentencing hearing.  Your Honor needs to consider all of the facts and circumstances that go to Mr. Kaplan's characteristics, the fact that he ultimately has been accused of participating in this, and in terms of evidence, there are police reports with respect to this, and people have made statements with respect to this, and the case is pending.  It hasn't been resolved, granted.  It also hasn't been dismissed.

So, I think it's perfectly appropriate for Your Honor to consider it, and consider it in the context of the fact that these are allegations that have yet to be proven in the state court proceeding.  I don't think there's anything wrong with that, and I don't think there -- that Your Honor is incapable of figuring that out and weighing that appropriately.

To that end, Mr. Kaplan's girlfriend at the time, who's with him, made a statement that she was there to sell the pills. She was there to sell 60 pills.

We know, from pharmaceutical records, that Mr. Kaplan picked 60, 30 milligram oxycodone pills from a pharmacy under the alias "Shawn Mullins," just hours before that transaction occurred.

So there's that, and additionally, in the weeks before he was arrested, he was surveilled in this case by DEA agents, and those DEA agents watched him conduct what they believed to be a hand-to-hand. They watched him meet someone in the parking lot, approach the driver, passenger side window of the car, hand something through the car, and get back in his car and leave. Again, those are the "facts" from the perspective of what we know and what we understand to have happened.

And so I just think it's important for the Court to understand that this wasn't just bulk distribution. This wasn't just giving to Mr. McCann. He was distributing to other people, as well.

If you would just give me a moment, Your Honor?

(Pause.)

MS. RICHARDS:  In the end, Your Honor, I think you're confronted with two Jesse Kaplans.  I think you're confronted with the Jesse Kaplan that the witnesses spoke about and that is reflected in the letters, and I think you're confronted with the Jesse Kaplan who has had very negative interactions with law enforcement, both prior to his arrest and during the course of his supervised release.

Probation did not have -- does not take the same view of Mr. Kaplan that Mr. Thomas does.

I think reality is he is, in fact, both people.  I think that he is someone who his own doctors have called "manipulative."  I believe that if it's in his best interest, he will do what he needs to do to get what he wants, and my concern is making sure that what he wants is not to do drugs, and I think that the best way to do that is to give him a significant period of incarceration so that he finally understands there are genuine consequences to what he did, and there are genuine consequences to distributing a narcotic that is so addictive, and so painful, and so destructive.

So we would ask for a sentence of 57 months.

Thank you, Your Honor.

THE COURT:  Thank you, ma'am.

MR. THOMAS:  May I respond, Your Honor?

THE COURT:  Of course.

MR. THOMAS:  Government counsel addresses Your Honor in the softest, most reasonable voice, but what she's urging upon Your Honor is not soft nor reasonable.

In essence, the argument for general deterrence, because of the nature of this crime, is the same argument that for decades has led to the overincarceration of low-level drug dealers for the -- to serve the principle that others in the world who might engage in similar conduct will be deterred by that message.  There is no limiting principle to general deterrence.

More fundamentally, it ignores the specifics of the individual, how that person got to the point where they were engaged in criminal activity.  Is this person one who is, by history to a certainty or to a high probability, likely to engage in further criminal activity?

Specific deterrence, likewise, to send the message to Jesse Kaplan, that this conduct was unacceptable, as if he doesn't understand that because he didn't say some words that Government counsel wants him to say when, in fact, he did say he accepts the responsibility for his actions, that he understands his

behavior is not excusable.

In the sentencing memoranda that I sent to Your Honor, we acknowledge, and I say "We" because I represent Jesse Kaplan, that this is a serious offense, but the fact of seriousness does not in all cases, at all times, for all defendants, drive, either because of general deterrence or specific deterrence, a sentence at the top of a Guideline range.

The Government engages in really selective perception and pulling out unsubstantiated information that it claims to be fact, that is accusation in a pending case yet to be proven to establish a point that Jesse Kaplan aggravated, in a sense, the seriousness, by himself engaging in drug sales because someone said that she was distributing drugs and there is a charge of distribution pending, or that agents saw what they thought appeared to be a hand-to-hand sale.

What he did and what he's admitted doing was serious enough, but that, as I said, does not compel a sentence within the Guideline range, much less a sentence at the top of the range.

As I said, the Government, I think, engages in selective perception, speaking in soft terms that appear to be reasonable, that asks for a sentence at the top of the range, and in its sentencing memorandum

31

it said it does that, not because that is the range that is the correct range under the law for what Jesse Kaplan himself did, and for what he himself agreed to do, but out of its consideration of the Defendant's purported mental health and drug addiction issues, purported.

"Purported" is a telling word, Your Honor, that implies that there were no mental health issues, that there were no drug addiction issues.  The record is replete with information, both in the presentence report, not objected to by the Government, and augmented by the letters from Mr. Kaplan's treaters, that his mental health and addiction issues are serious and longstanding, but more importantly and most importantly, are being managed by an individual who, until the time of this case, did have a troubling pattern of criminal convictions, but because of the intervention through the services of the Court, through his own commitment, through professionals who know how to deal with problems like this, have transformed Jesse Kaplan.

The Government said there are two Jesse Kaplans.  In a sense that is true.  There's the Jesse Kaplan before treatment; there's the Jesse Kaplan after treatment.  There's a Jesse Kaplan before age 13 living

an idyllic life, a childhood blessed with a loving family in a wonderful environment, and then the crash, the void, the destruction that fell upon the family when his beloved mother died.

Government has, in its brief, argued that, "Well, things like that happen to a lot of people and they don't turn to crime." That is probably so, but of all the families that I have known, and I had been unfortunate to have some very close friends lose, at middle (phonetic) of their lives, two mothers, or three mothers and one father, at a point where there were still children at home, their families were wrecked, and the consequences were prolonged and destructive and are still being played out, and that is exactly what happened with Mr. Kaplan here today, and it's not a purported problem.

What is important is that it's a problem that has now been embraced by Mr. Kaplan, by his father, by his family, by his friends, by professionals, and what it proves fundamentally, is an important fact of life, and that is that people do change. Some change for the worse; some change for the better. Jesse Kaplan has shown the ability and the commitment to change for the better, to get hold of his demons, to get hold of his problems, and to deal with them in a concerted way that

takes a lot of work. This is not an easy project.

So, while the Bureau of Prisons does offer some services, they are not, of course, at all of the quality, the intensity of community services that can be provided in our region of the country.

So, with that mind, Your Honor, I would urge the Court to find that a sentence of 57 months is far longer than needed to punish Mr. Kaplan. He previously did a sentence of nine months. Afterwards, he has committed this crime. Arguably, a sentence longer than that would make sense, given the normal imposition of incrementally higher sentences, but a leap from 9 months to 57 months or 46 months is far more than needed to serve that purpose, and ignores the intervening mitigating circumstances of the personal transformation that Mr. Kaplan is undergoing.

Thank you.

THE COURT: Thank you, sir.

Would you have your client come back to the lectern, please, and I'll ask the Government if they want to respond to Mr. Thomas' remarks?

MS. RICHARDS: No, Your Honor.

THE COURT: Thank you.

THE DEFENDANT: Yes, Your Honor.

THE COURT: I think I've indicated to you,

Gentlemen, that my decision was that the Guideline range of 46 to 57 months is appropriate and I so find, and I sentence the Defendant to the custody of the Bureau of Prisons for a period of 57 months, to be followed by a term of supervised release of three years.

Your probation officer will explain to you, sir, what the standard conditions of supervised release are, but I'm adding the following.

The first one is obvious. You should not commit another federal, state or local offense.

You shall not unlawfully possess a controlled substance, any controlled substance.

You shall refrain from any unlawful use of a controlled substance, and submit to one drug test within 15 days of release on supervised release, and at least two periodic drug tests thereafter, to determine whether you are using a controlled substance.

You shall cooperate in the collection of a DNA sample. You shall participate in a program approved by the probation office for inpatient or outpatient substance abuse treatment and testing. It's very important, sir, that you participate in such a program. I would really hope that you're going to be able to conquer your problem.

To the extent that you can pay some or all of the cost of that program based on your ability to pay, as determined by the probation officer, you shall do so.

You shall participate in a program approved by the probation office for mental health treatment, and to the extent, again, that you can pay for some or all of the cost of such a program, you shall do so.

And lastly, sir, you shall not possess a firearm or other dangerous weapon.

Now, I placed you on supervised release, sir, for a period of three years.  Violation of supervised release will expose you to a further prison sentence of two years, so I strongly urge that you obey the conditions of your supervised release.

I am sorry you had a problem yourself.  I seen this so often, it's very heartbreaking, but anybody who has such a problem and nevertheless engages in conduct which would provide such a problem for somebody else doesn't get that much sympathy from me.

So, sir, you have -- in your Plea Agreement you have waived your right to take an appeal as long as I don't give you more than 57 months of incarceration nor three years of supervised release.  I haven't exceeded those limitations, sir, however, if you and

Mr. Thomas believe that an appeal is nevertheless viable, you should file your notice of appeal within 14 days, and I, of course, will provide you with an attorney to perfect the appeal if you need one.

I think that is all except that I believe that the Government is going to move for dismissal of Count Two; is that correct?

MS. RICHARDS:  Yes, Your Honor, and I would also just ask the Court's indulgence.  I'm not sure if I missed this, whether or not the Court inquired of the Defendant and Defense Counsel, if they have read the PSRs, and also --

THE COURT:  I did not ask them and I would -- but I think from the remarks, at least of Mr. Thomas, that they have.

Did you read your Presentence Report, sir? Did you read it?

THE DEFENDANT:  Me, Your Honor?

THE COURT:  Yes, you.

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  It's your Presentence Report.

Yes, and Mr. Thomas had some objections to the contents of it.

MR. THOMAS:  We did, Your Honor, and I would like to add to the record, with respect to the

objection pertaining to quantity, Your Honor ruled in our favor.

I had asked that several sections of the Presentence Report be stricken, those being most particularly those having to do with accusations in the police reports pertaining to the pending case in Richfield, Connecticut.

My reason for --

THE COURT:  You don't deny that there is a pending case?

MR. THOMAS:  There is a pending case.  It's quite appropriate to identify that the case --

THE COURT:  Sure.

MR. THOMAS:  -- is pending, but to set forth in detail, the accusations, I think, is -- elevates those accusations from police reports to a level of probability that is not supported, and it carries potentially prejudicial affect into the Bureau of Prisons, as part of the report that will be used to determine whether or not Mr. Kaplan is eligible for the types of programs that Government counsel suggested would be appropriate.

With those accusations in it, I think that does present some prejudice, and those are at paragraphs 40 and 41 of the Presentence Report.

I have no objection to stating that the charges are pending, but I do believe that the detailed description of what the police report said should be stricken, and I make the request that that be done, certainly.

THE COURT:  I do not intend to do that, sir.

MR. THOMAS:  Pardon?

THE COURT:  I am not going to strike them.

MR. THOMAS:  Secondly, Your Honor, Your Honor did not address the two issues which -- the mandatory hundred dollar special assessment --

THE COURT:  Hundred dollars special assessment.  You're correct, I did not.

MR. THOMAS:  And I would urge Your Honor to find that Mr. Kaplan is not in a position to pay a fine.

THE COURT:  I am not going to fine him, no.

MR. THOMAS:  And then finally, Your Honor, or not finally yet, I would ask Your Honor to recommend to the BOP, understanding that it makes its decisions about placements on a variety of considerations, but that there are two facilities that are relatively close to Mr. Kaplan's residence and his family to facilitate visitation, which also offer the 500-hour drug treatment program, and I'd ask Your Honor to recommend,

understanding that the Bureau gives some consideration to that: the prison camp at Canaan and the low security prison at Danbury, and that Your Honor recommend that he be allowed to participate in the 500-hour drug treatment program.

THE COURT:  Five hundred hour program.

I'm happy to make those recommendations, sir, but as you noted, I don't have control over where the Bureau of Prisons will incarcerate a defendant, but I certainly make that recommendation, and I make it in consideration of his family.  I would hope that they would be able to visit him from time to time.  I think that's very important.

MR. THOMAS:  Thank you.

And then there is one final, and I believe it is final, request.  I would imagine there will be objection to this as there has been down the line, but that is that Mr. Kaplan be permitted to remain released pending voluntary surrender to the facility designated by the BOP.

There are exceptional circumstances that support that --

THE COURT:  He's in programs now, right?

MR. THOMAS:  Correct.  And for the best transition and the best opportunity to support Mr.

Kaplan in this stressful time before he goes into a program where -- a prison setting where there will be programming available, and not shunted through jails where he would just be held, that he be permitted to continue on release in the community on the same conditions that he's been abiding by, most significantly being home confinement, with the exception of participating in the drug treatment programs.

THE COURT:  I'm not aware of any violation of those conditions.

MR. THOMAS:  Thank you, Your Honor.

MS. RICHARDS:  And, Your Honor, I can make this easy, particularly in light of the letters that Mr. Thomas submitted with respect to some of his health care providers who stated that the therapy is helping to -- adjustment to the possibility of being incarcerated, and what that means, the Government has no objection.

THE COURT:  Thank you.

So I'm granting your request at this time.

MR. THOMAS:  Thank you, Your Honor.

THE COURT:  I hope that you are successful in these programs, sir.  I realize that drug addiction is a very serious problem.  Unfortunately, I hear about it

all the time, and I hope that you are able to conquer it, and that your conduct in the future will not lead to conduct which will encourage other people to have that problem.

You understand what I'm saying?

THE DEFENDANT: Yes, Your Honor.

THE COURT: You yourself know what addiction is.

THE DEFENDANT: Yes, Your Honor.

THE COURT: Okay. I hope you are successful in your treatment.

THE DEFENDANT: Thank you, Your Honor.

THE COURT: Thank you.

MS. RICHARDS: Your Honor, I think the only thing left for us to do, I think you mentioned, is the Government is moving to dismiss Count Two of the Indictment at this time.

Additionally, I think Your Honor needs to set a self-surrender date for the Defendant. I would ask that it be, I would say maybe a month, three weeks, something along those lines.

THE COURT: It sometimes takes six weeks, I believe, for a indication of a facility.

MR. THOMAS: I think that six weeks is the typical time that it takes.

42

MS. RICHARDS:  That's fine, Your Honor.

THE COURT:  So you will be at liberty for that period of time, and if, in the interim, you are designated to an institution, sir, then you're going to have to report to the United States Marshal's office. Okay?

THE DEFENDANT:  I understand, Your Honor.

THE COURT:  Okay.

MS. RICHARDS:  And, Your Honor, if I may? Six weeks -- I just want the Defendant to have --

THE COURT:  A date?

MS. RICHARDS:  Yes, all the information that he needs.

MR. THOMAS:  That may put us into January.

MS. RICHARDS:  I think it does.  That's why I wanted just to check.

THE COURT:  I've got a calendar year.  We can figure it out.  Have you got it?  January is --

MS. RICHARDS:  It's actually right before New Year's Eve, Your Honor.  It's December -- It appears to be December 30th is six weeks.

MR. THOMAS:  May I request the following week, Your Honor?

THE COURT:  Excuse me?

MR. THOMAS:  Some date middle of the first

43

week in January?  In part, I don't know how timely the designation by the Bureau will be, given the holidays.

(Pause.)

THE COURT:  What was the date you asked for?

MR. THOMAS:  Some date within the first full week in January.

THE COURT:  First full week of January?  How about the 8th -- January 8th?  That's a Tuesday.

MS. RICHARDS:  I'm sorry, Your Honor, January 8th?

THE COURT:  January 8th.

MS. RICHARDS:  Which is a Thursday.

THE COURT:  Oh, I'm sorry.  I --

(Pause.)

THE COURT:  You are correct, ma'am.  It is a Thursday.  I'm looking at -- I have the wrong year.  Okay.

Is there anything else?

MR. THOMAS:  No, Your Honor.

MS. RICHARDS:  Nothing for the Government, Your Honor.  Thank you.

THE COURT:  All right.  Thank you.

(Proceedings concluded at 10:40 a.m.)

44

CERTIFICATE

I hereby certify that the foregoing 43 pages are a complete and accurate transcription of my original stenomask voice notes taken of the Sentencing Hearing in the matter of: THE UNITED STATES OF AMERICA, Plaintiff, versus JESSE KAPLAN, Defendant, Criminal Action Number 3:13-CR-00230 (EBB), which was held before the Honorable Ellen Bree Burns, Senior United States District Court Judge, 157 Church Street, New Haven, Connecticut, on November 18, 2014.


/s/_____        January 30, 2015
STEPHEN C. BOWLES
Official Court Reporter